# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| CATHERINE BLAIR | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
|      vs. | )       Case No. 4:05CV2047MLM |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security | ) |
| | ) |
|      Defendant. | ) |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405 (g) for judicial review of the final decision of defendant Jo Anne B. Barnhart ("Defendant") declaring a cessation of disability benefits for Catherine Blair ("Plaintiff"). Plaintiff has filed a brief in support of her Complaint. Doc. 16. Defendant has filed a brief in support of her Answer. Doc. 18. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc. 8.

### I.
### PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on August 17, 1999. (Tr. 11, 72-75). Plaintiff alleged she was disabled as of June 1,1996, due to depression, anxiety disorder, panic attacks, post traumatic stress disorder ("PTSD"), suicidal tendencies, migraines, fibromyalgia, hallucinations, inability to deal with people, time loss, and being easily upset. (Tr. 11, 72). An ALJ found Plaintiff disabled as of June 1, 1996, and awarded her benefits on August 9, 2000. (Tr. 22-25). On May 10, 2003, the Social Security Administration (the "SSA") notified Plaintiff that her case was being reviewed. (Tr. 350-351). On August 13, 2003, the SSA notified Plaintiff that her disability had ceased and that her benefits would terminate. (Tr. 346-349).

Plaintiff filed a request for reconsideration on September 16, 2003. (Tr. 343). The SSA issued an unfavorable decision on December 12, 2003. (Tr. 331-340). On December 18, 2003 Plaintiff filed a request for a hearing by an Administrative Law Judge ("ALJ"). (Tr. 329-330). On May 27, 2005, ALJ J. Pappenfus found that Plaintiff's disability had ceased as of August 2003. (Tr. 8-18). On June 27, 2005, Plaintiff filed a request for a review of the ALJ's decision with the Appeals Council. (Tr. 7). On October 6, 2005 the Appeals Council denied Plaintiff's request for review. (Tr. 4-6). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that at the time of the hearing she weighed around 230 or 235 pounds; that she lived in a home with her mother, daughter and fiancé; that she had a son who did not live with her; that both her daughter and son received SSI payments because Plaintiff was disabled; and that her fiancé was not on disability and was not employed. (Tr. 32-33, 41).

Plaintiff testified that she cares for her mother who receives Social Security disability; that her mother suffers from severe depression; that her mother underwent hip replacement surgery two years ago causing partial paralyzation of her right leg and that her mother uses a walker. (Tr. 33, 50). Plaintiff further testified that she cares for her mother by doing her laundry, cooking, taking care of her two dogs, and cleaning the house; and that her mother requires assistance getting dressed, moving from room-to-room, going up and down stairs and bathing. (Tr. 40, 50).

Plaintiff further testified that she completed high school; that she has about 12 or 13 college credits; and that she was not employed at the time of the hearing. (Tr. 34, 48). Plaintiff also testified she previously worked as a bookkeeper/accountant, cashier, waitress, factory worker, fast food worker, and in sales selling sculpture. Plaintiff said that she was a factory worker for a few months in 1994 or 1995 and that as a factory worker she was a machine operator and as an inspector. Plaintiff

2

testified that she last performed cashier duties in late summer 1995, immediately prior to her bookkeeping job; that her duties as a bookkeeper included turning in financial reports once a week, receiving and distributing the payroll, and using a computer to enter data for shipping, receiving and payments to vendors; that she spent six hours of an eight hour workday sitting in her bookkeeping job and that she lifted a maximum of twenty pounds; that she worked full-time while bookkeeping; and that she stopped working as a bookkeeper in the spring of 1996. (Tr. 40, 46-47).

Plaintiff also testified that she had been through rehab three times for alcohol and drug abuse; that she stopped attending AA meetings around 1996 or 1997; that at the time of the hearing she had been sober for almost five years; and that she had continually attended AA meetings since 2000. (Tr. 35, 48-49).

When asked what physical problems prevented her from working, Plaintiff responded that she could not work due to fatigue from lack of sleep; that she could not stay asleep; and that she had nightmares. The ALJ then asked Plaintiff if it was her testimony "today [] that you have no physical impairments?" Plaintiff responded that she had no physical impairments. When asked about any mental impairments that prevented her from working, Plaintiff responded that she had trouble concentrating and remembering things. When asked why she had difficulties concentrating and remembering things, Plaintiff responded that she did not know. (Tr. 36).

Plaintiff further testified that she was being treated by Dr. Ohlms for depression and anxiety; that she was taking Risperdal, Effexor, and Zoloft; that she had severe sleepwalking and sleep eating syndrome; that Dr. Ohlms thought her sleepwalking and sleep eating might be side effects of her medications; that he corrected the medication; that the sleepwalking stopped for a while; that her sleepwalking came back; and that she had started taking Zoloft the week prior to the hearing to help

the sleepwalking and sleep eating. Plaintiff said that Dr. Ohlms was the only doctor treating her for her mental impairment. (Tr. 36-38).

Plaintiff stated that she wakes up in the mornings between 3:30 and 5:00 a.m.; that she prays and meditates; that she takes her medications; that she talks to a friend every morning at 6:30; that she spends time with her daughter from 7:00 to 8:00 a.m.; and that she takes her daughter to school. Plaintiff further stated that she attends AA meetings on Mondays, Wednesdays, and Fridays; that she might stop by the grocery store or the pharmacy in the afternoon; that between 1:00 and 3:00 p.m. she sits with her mother, makes phone calls for doctor's appointments, "or [pays] bills, or just phone calls that I need to make to take care of life business"; that she picks up her daughter at 3:00 every day, takes her to a violin lesson on Thursday nights at 6:30, and attends her school activities; that she picks up her son at 7:00 on Sunday mornings; that she and her son attend church and Sunday school together; and that after doing so Plaintiff and her son usually return to Plaintiff's house to visit with Plaintiff's mother for about an hour. (Tr. 38-40).

Plaintiff testified that she smokes two packs a day; that her hobby is reading; that she no longer performs yard work; and that she told one of her doctor's in 2002 that she went camping. (Tr. 41, 50).

### III.
### MEDICAL and OTHER RECORDS

#### A. Third Party Questionnaires:

On June 3, 2003, Plaintiff's mother, Agnes M. Johnson, completed a "Daily Activities Questionnaire." Ms. Johnson reported on this questionnaire that Plaintiff experienced difficulties sleeping, concentrating, organizing, and completing projects; that Plaintiff was always tired and fatigued; that she had low energy; that she had nightmares; that she had sudden changes in mood; that she had lost interest in previously enjoyed activities; that she sometimes neglected her own and her

children's appearances; that she sometimes disregarded her personal hygiene for days at a time; and that she had decreased motivation; and that she avoided large groups of people and strangers because they caused her to have extreme anxiety. Ms. Johnson also reported that Plaintiff's "disposition-attitude-state of mind sometimes changed very abruptly without any precipitating event." (Tr. 450).

Additionally, on October 20, 2003, Ms. Johnson completed a "Functional Third Party Report" in which she reported that she lived with Plaintiff in a house; that the two would spend most of their time together; that they did crafts, watched television and talked; that Plaintiff drove Ms. Johnson to her medical appointments and anywhere else she needed to go; that Plaintiff brought her daughter to and from school; that she shopped for groceries; that she read and wrote in a journal; that she did laundry; that she attended AA meetings and talked on the telephone with her AA sponsor; and that she prepared dinner, payed bills, and went to medical appointments. Ms. Johnson further noted that Plaintiff "does not do all of these things every day, but she usually does some of these things on any given day." (Tr. 420). Ms. Johnson further reported that Plaintiff took care of the family pets by feeding them, bringing them to the veterinarian, and bringing them outside and that Plaintiff's daughter assisted Plaintiff in caring for the pets. (Tr. 421).

Ms. Johnson reported that Plaintiff could no longer concentrate long enough to complete tasks; that Plaintiff had difficulty with housework and yard work; that she could, with encouragement, do laundry; that Plaintiff could not multi-task; that her energy level had greatly decreased; that Plaintiff's hobbies included reading and doing crafts several times per month; and that because of Plaintiff's illness, her inability to concentrate, and her lack of energy, Plaintiff had difficulty concentrating, understanding, reading and talking. (Tr. 421-425).

Ms. Johnson further reported in the October 2003 questionnaire that Plaintiff's illness affected her sleep; that she had frequent insomnia and "waking during the night"; that she would sleep-walk

every night; that the frequency of Plaintiff's sleep-walking had increased; and that Plaintiff's doctors had been unable to cure Plaintiff's sleep-walking. (Tr. 421, 426). Ms. Johnson also reported that Plaintiff needed verbal reminders to take her medication and that she usually prepared simple and quick meals for herself. (Tr. 422).

Ms. Johnson stated that Plaintiff went outside daily; that she drove a car; that she could leave the house alone, shop, pay bills, count change, and handle a savings account, a checkbook and a money order; that her ability to handle money had not changed since the onset of her illness; that she visited friends and family members; that she occasionally attended a movie; that Plaintiff did not need to be reminded to go places; that she did not need anyone to accompany her when she would leave home; and that she did not have any problems getting along with family, friends, neighbors or others. (Tr. 423-425)

Mrs. Johnson also reported in the October 2003 questionnaire that Plaintiff could follow written and oral instructions fairly well; that she had no problem getting along with authority figures; and that she had never been fired or laid off from a job because of problems getting along with people. (Tr. 425-426). Ms. Johnson also reported that changes in routine were usually not a problem for Plaintiff and that "[a]ll things considered, [Plaintiff can handle stress] very well as long as she is able to attend AA meetings, receives support from family and friends, and has opportunities for down time." (Tr. 426).

**B.      Claimant Questionnaires:**

In a questionnaire signed on April 15, 2003, Plaintiff reported that she "suffer[s] from severe depression, PTSD, and a severe sleep disorder. Combined, these illnesses and their symptoms keep me from working. These manifestations range from hallucinations, panic attacks and insomnia to impaired thought process, lack of long-term memory and sleepless nights." Plaintiff stated that she

had not "experienced the most severe of symptoms or hospitalizations in the past two years" and that she is unable to return to work. (Tr. 433).

Plaintiff reported in this April 2003 questionnaire that she sees Dr. Mertens for exams and for diabetes treatment; that she sees Dr. Ohlms for her depression, PTSD, sleepwalking and sleeplessness; that she had seen Dr. Ohlms every two months since 1999; and that she last saw Dr. Ohlms in July 2003. (Tr. 434).

With respect to her daily activities, Plaintiff stated in the April 2003 questionnaire that her doctors had not placed any limitations on her activities other than those she had previously reported; that she worked out three times a week for thirty to forty-five minutes; that she combed her hair, brushed her teeth, washed her hands and face daily; that she bathed regularly except when depressed; that she cooked, cleaned, and shopped; that she was frequently overwhelmed by tasks; that she was frequently unable to start tasks; that she was rarely able to finish tasks; and that she went to AA meetings three to five times per week. Plaintiff further stated that she usually had relatives come to her house. (Tr. 435-36). Plaintiff stated that "I live in a world of uncertainties. I can't make plans, because I never know what days I'll be 'down' or 'stressed.' I avoid large groups, noisy environments and contact with most people. My thoughts are usually fragmented and unrelated. It is difficult for me to communicate." (Tr. 438).

On May 14, 2003, Plaintiff completed a "Report of Continuing Disability" in which she stated that her disabling conditions are clinical depression, anxiety disorder and PTSD; that she has not been hospitalized in over two years; that her only new illnesses since her last report are pre-diabetes and esophogeal erosion; and that she is unable to return to work. Plaintiff further stated that she has "no physical difficulties concerning mobility. However, my disorders do prevent me from any regimented exercise program. My physical activity level depends on my daily state of mind. On 'bad days' I do

as little as possible, on 'good days' I am quite active," exercising, biking, walking, and cleaning the house. Plaintiff stated that she has gone a month without bathing; that on average she bathed and groomed every three to four days; that she cooked every day; that she shopped for groceries at least once a week; that her housecleaning and "odd jobs" were sporadic; that her recreational activities and hobbies were very limited; that her hobbies included reading and writing in a journal on a daily basis; that usually her family and friends visited her at home; and that she attended AA meetings two to three times per week. (Tr. 451-56).

Plaintiff also stated in this May 14, 2003 report that:

> While I have improved in some areas, my abilities to deal with life stresses continues to be erratic. My condition has improved greatly over the past few years. I am no longer in need of repeated hospitalizations. However, the improvement is slow. I still encounter great difficulty when it comes to coping with everyday life. I am easily overwhelmed by parental responsibilities, as well as the everyday adult responsibilities. Often I find myself paralyzed by fear and anxiety, helpless to function in a "normal" way. My social circle is small, and maintaining relationships is still an area I struggle in. Communication with others is made difficult by disjointed thoughts, and the inability to concentrate, both symptoms of my disability. Unfortunately, I am unable to predict the frequency, severity, or longevity of my depressive episodes, so it is difficult to make commitments to others, or even to myself. My life and abilities have improved, but they are far from what would be considered normal or functional.

(Tr. 456-457).

On May 28, 2003, Plaintiff submitted a "Claimant Questionnaire" in which she stated that her symptoms included night terrors, anxiety attacks, rages, crippling depression, isolation, and suicidal/homicidal thoughts and urges. Plaintiff stated that all of her symptoms have lessened, especially over the past year; that a few ceased altogether; that she still had episodes of depression and extreme anxiety; and that she still struggled to function. Plaintiff further reported that "just about any stress can trigger my anxiety" and that " the weather, a flat tire, or just waking up on the wrong side of bed can cause my symptoms to worsen." Plaintiff also reported that she experienced trouble with her symptoms

about once a month for about two to five days; that she prayed a lot, which usually helped relieve her symptoms for a short period of time; that attending AA meetings three to four times a week was very effective at providing longer relief; that sometimes meditating and contacting her "support people" helped relieve her symptoms; and that attempts to reduce her medications were unsuccessful. (Tr. 446).

Additionally, Plaintiff stated in the May 28, 2003 questionnaire that she could no longer work or be around large, loud crowds; that she had difficulty planning her menus for her pre-diabetes restricted diet; that she did all of the grocery and household shopping without any help; and that she shopped late at night or very early in the morning to avoid people. (Tr. 447).

Plaintiff also reported in the May 28, 2003 questionnaire that she could physically do all of the household chores and that a load of laundry might take two days to complete. (Tr. 447). Plaintiff further stated that she enjoyed watching television and that "I have to be careful about watching any medical programs, because I automatically think I've got whatever they're talking about." (Tr. 448-449).

Plaintiff further stated in the May 28, 2003 questionnaire that she would leave her house every day and that she had no difficulty driving or using a telephone. (Tr. 448-49). She further stated that she was hospitalized for gall bladder surgery since she filed her claim; that she had a physical examination which revealed her pre-diabetic condition; and that "there has been improvement in my condition, but there are also still times when it seems like there hasn't been." (Tr. 449).

On October 13, 2003, Plaintiff completed a "Questionnaire" in which she reported that she was not currently working due to depression and anxiety. In addition to matters she addressed in her previously completed questionnaires Plaintiff reported that since she was first diagnosed with

depression at age fourteen she has had difficulty falling and staying asleep and that side effects from her medication included sleepwalking. (Tr. 429-30).

**C.     Medical Records**:

Records David Ohlms, M.D., reflect that Plaintiff was hospitalized on May 25, 2000, and that the diagnosis at this time was at Axis I, major depressive psychotic features recurrent, generalized anxiety disorder, panic attacks by history; at Axis II, deferred; at Axis III, Von Willibrand's disease, migraine headaches, post hysterectomy; at Axis IV, severe financial, poor social system, living with mother, unemployed; and at Axis V, current GAF of 30.  Dr. Ohlms noted that 50 was the highest GAF Plaintiff had in the past year and that her prognosis was guarded. (Tr. 159-61).

Treatment notes dated March 6, 2001, state that Plaintiff was "doing ... well"; that her boyfriend "continue[d] to relapse in prison"; that "things [were] stressed at home financially"; that Plaintiff had been clean and dry for one year; that she had been very active in her AA program; that she had applied for Medicaid; and that Plaintiff was taking medication.  (Tr. 499).

Notes of December 18, 2001, state that Plaintiff's mood was good and serene; that she experienced occasional insomnia; that she was not sleepwalking; and that she was taking medications. (Tr. 498).

Notes from September 19, 2002, state that Plaintiff was doing well. (Tr. 497).

On August 30, 2002, Plaintiff was hospitalized at St. John's Mercy Medical Center with complaints of nausea and vomiting and with a diagnosis of dehydration, vomiting and nelana. (Tr. 547). Craig D. Pope, M.D, examined Plaintiff and reported that Plaintiff had a history of "ethanol" abuse and drug abuse; that she denied IV abuse; that she had been clean for 12 years; and that she was "on disability secondary to psychiatric history."  With respect to Plaintiff's appearance, Dr. Pope reported that she was well-developed and well-nourished; that she was obese; that she was in no acute distress;

and that she appeared her stated age. Dr. Pope also noted that Plaintiff's medical history included Type I von Willebrands disease, migraine headaches, allergic rhinitis, depression, and anxiety status post PTSD which was well controlled with her psychiatric medications. Dr. Mertens approved this report. (Tr. 547).

Brian C. McMorrow, M.D. also saw Plaintiff on August 30, 2002 at St. Johns Mercy Medical Center. Dr. McMorrow's notes of this date state that Plaintiff was a recovered alcoholic; that she had not had a drink in twelve years; and that she had a history of depression and migraines. Dr. McMorrow's notes also reflect that Plaintiff did not report any delusions, hallucinations, or suicidal ideations; that Plaintiff was an obese and in no acute distress; that she was resting comfortably in bed; and that she was alert and oriented times three." (Tr. 551-53).

On August 31, 2002, Alfred O. Greco, M.D., examined Plaintiff at St. John's Mercy Medical Center and noted that Plaintiff had a history of alcohol and drug abuse; that at the time she did not have any problems with alcohol or drugs; and that Plaintiff had a family history of depression. (Tr. 513-515, 549-550). Records reflect that Plaintiff was discharged from St. John's Mercy Medical Center on August 31, 2002. (Tr. 546).

Marsha Mertens, M.D., reported that she saw Plaintiff on October 3, 2002 for a follow up; that her assessment of Plaintiff included nausea, gastroesophageal reflux disease ("GERD"), and erosive esophagitis; that Plaintiff was continuing to see her psychiatrist; that there were no new changes in Plaintiff's medication; and that her appetite was very good. Plaintiff reported on this date that "she has continued to improve and that her appetite was good.[1] (Tr. 495).

Dr. McMorrow reported on September 3, 2002, that his impression was erosive esophagitis, a normal colonoscopy, a normal stomach, and a normal duodenum. (Tr. 510). H. Martin Altepeter,

---

[1]    Notes of this date are otherwise not legible.

M.D., reported that on November 22, 2002 Plaintiff underwent a laparoscopic cholecystectomy at St. John's Mercy Medical Center. (Tr. 544-545).

Records of St. John's Mercy Medical Center reflect that on December 1, 2002, Plaintiff was admitted due to fever, nausea, vomiting, frequent diarrhea, and bloody stools. Tammy Martin, M.D., reported during Plaintiff's hospital stay that Plaintiff had intractable post operative GERD and colitis. Dr. Martin reported during Plaintiff's hospital stay that Plaintiff was anxious and moderately distressed. Records reflect that Plaintiff was discharged on December 2, 2002 with instructions to resume her medications at home. Upon discharged Dr. Martin reported that Plaintiff could return to work or school with full activity the next day. (Tr. 526-34).

Dr. Mertens reported that she saw Plaintiff on March 3, 2003, for a physical examination; that Plaintiff was 5'4" and weighed 232 pounds; and that her impression was that Plaintiff had GERD with erosive esophogitis, "WWE (no cervical dysplasia)," lipids, and ERT. (Tr. 494).

On May 23, 2003 Dr. Mertens reported that Plaintiff was well nourished and in no apparent distress; that her activity level was "O.K."; that her weight was 226 pounds; and that her problems included depression/anxiety, PTSD, lipids, and GERD. (Tr. 492-493).

On May 20, 2003, a Disability Interviewer with the SSA reported that Plaintiff had no difficulty breathing, seeing, speaking, hearing, sitting, walking, standing, writing, reading, comprehending, responding, using her limbs, or relating to people. The interviewer further reported that Plaintiff "was unsmiling (flat affect), quiet and almost tearful" and that Plaintiff needed assistance in processing the Disability Claim. (Tr. 460-461).

On July 7, 2003, W. Bruce Donnelly, M.D., reported that Plaintiff had allergic rhinitis and GERD; that she recently had acute bronchitis; that these conditions were all readily treatable; and that she was "physically not severe." (Tr. 388).

On July 24, 2003, Harry J. Deppe, Ph.D., examined Plaintiff at West Park Medical Clinic. Dr. Deppe noted that Plaintiff was a thirty three year-old divorced African-American female; that she stated that she was seeking disability because "I have a lot of problems with sleep and I still have these mood swings, but I don't know I'm feeling better than I have for awhile I don't know I just can't get my life on tract [sic]." Dr. Deppe reported that Plaintiff was cooperative and appeared to answer questions to the best of her ability. (Tr. 518).

Dr. Deppe's report reflects that Plaintiff was on time for the appointment; that she was 5' 4" inches tall and 235 pounds; that she wore neat and clean clothes; that her hygiene and grooming appeared good; that Plaintiff had been married twice; that she had two children; that her 14 year old son resided with his father; that her 9 year old daughter resided with her; that she had regular contact with her son; that she attended school until eleventh grade; that she earned a GED in 1988 and attended some college; and that she was never enrolled in any special education courses. (Tr. 518).

Dr. Deppe's report further states that Plaintiff had a history of crack cocaine, cocaine, marijuana, LSD, methamphetamines, and excessive alcohol abuse; that she had undergone in-patient treatment for polysubstance abuse; that she had been clean and sober for about twelve years; that she attended AA meetings on a regular basis; and that she had never experienced legal difficulties; and that Plaintiff's last in-patient treatment was about three years prior after she "kinda lost it I mean I couldn't sleep I couldn't stop crying I would talk constantly and I wasn't making any sense so my doctor put me in the hospital." Dr. Deppe report further states that Plaintiff had been taking Effexor, Risperdal, Trazadone, Benzatropine, and Seroquil under the care of her psychiatrist, Dr. Ohlms. Plaintiff told Dr. Deppe that her medications were "helpful but I still have a lot of problems with sleep and I still have these mood swings I don't know sometime I just get real down and I don't wanna leave my room and I cry a lot." Plaintiff also told Dr. Deppe that Dr. Mertens was the treating physician for her diabetes

and she was controlling Plaintiff's diabetes through diet. (Tr. 519). Plaintiff denied current or past suicidal or homicidal ideations. (Tr. 520).

Dr. Deppe's report further states that Plaintiff said she was not employed; that she last worked about seven years ago as a bookkeeper for one year; and that "I had to quit because of my hospitalizations for my depression and anxiety and stuff like that and they just didn't understand at work." (Tr. 519).

Dr. Deppe reported that Plaintiff's mood was somewhat anxious; that her affect was generally within normal limits; that her eye contact was fair; that no delusional thinking was evident; that Plaintiff denied any current or past hallucinations; that she appeared to understand what was said to her because her response were coherent and "on task"; that she had no apparent thought confusions; that she had no difficulty hearing what was said to her; that her tone of voice was rather soft, audible, and understandable; that she was oriented to time, place and person; that she was able to give the correct day, date, time, home address and home phone number; that her memory for recent and more remote events seemed fair; that she was able to recall six digits forward and three in reverse order; that she was able to recall the names of five Presidents of the United States, her social security number, her date of birth, and her mother's maiden name; that she was able to name five large cities in the United States; that she described Saddam Hussein as an "Iraqi bad guy" and stated that David Letterman "is on T.V. at night"; and that Plaintiff's "[f]und of general information appeared adequate." (Tr. 519).

Dr. Deppe's report also states that Plaintiff was good at performing simple calculations; that she could perform "Serial 7's" without errors and could list the months of the year in reverse order without errors; and that her abstract reasoning skills appeared adequate. (Tr. 520).

With respect to Plaintiff's work-related activity, Dr. Deppe reported that Plaintiff's ability to relate to others, including fellow workers and supervisors, her ability to understand and follow simple

instructions, social functioning, appearance, and her ability to care for personal needs were "fair"; that Plaintiff's ability to maintain the attention required to perform simple, repetitive tasks and her ability to withstand the stress and pressure associated with day-to-day work activity were "impaired"; and that Plaintiff's daily activities were moderately restricted. (Tr. 520).

Dr. Deppe's diagnoses was as follows: at Axis I, polysubstance dependance in remission and bipolar disorder mixed; at Axis II, deferred; at Axis III, diabetes by self-report; at Axis IV, 2; and at Axis V, 50. Dr. Deppe concluded that "when complying with medication [Plaintiff] appears capable of managing her own funds at this time." (Tr. 521).

On August 13, 2003, Martha McGee, M.D., reported on a psychiatric review technique form that Plaintiff's medical disposition was based on affective disorders; that a RFC assessment was necessary; and the medical portion of the disability determination was complete. (Tr. 389). Dr. McGee further reported that Plaintiff had a disturbance of mood, with a full or partial manic depressive syndrome; that Plaintiff's affective disorder was evidenced by "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)"; and that Plaintiff was in sustained remission of a substance addiction disorder. (Tr. 392-97). Dr. McGee reported that Plaintiff's activities of daily living were mildly restricted; that Plaintiff had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and that Plaintiff did not have episodes of decompensation of extended duration. (Tr. 399). Dr. McGee also noted that Dr. Ohlms, Plaintiff's treating psychiatrist, rated Plaintiff's ability to behave in an emotionally stable manner as "poor"; that Dr. Ohlms reported that Plaintiff had a poor ability to relate predictably in social situations, to demonstrate reliability, to understand and carry out simple tasks and to deal with stress, supervisors

and the public; and that Dr. Ohlms reported that Plaintiff had severe depression, and she had a history of alcohol dependance. (Tr. 401).

Dr. McGee also noted that Plaintiff had not been hospitalized in over two years in regard to her claims of clinical depression, anxiety and PTSD; that Plaintiff still saw Dr. Ohlms; that she had developed pre-diabetes and esophageal erosion; that she took care of her daughter; that she performed household tasks; that she drove daily; that she attended AA meetings two to three times per week; that usually family and friends would come to her house; that her condition had greatly improved over the last year; that she still struggled to cope with stress of any kind; that she had a small social circle; and that she was easily overwhelmed. (Tr. 401). Dr. McGee concluded that Plaintiff had shown significant medical improvement; that her symptoms were more stable; that her limitations improved from marked to moderate; that she now retained the ability for simple tasks; and that she would need some extra support in times of stress. (Tr. 403).

On August 13, 2003, Dr. McGee also completed a Mental Residual Functional Capacity Assessment ("MRFC") Form in which she reported that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, or in her

ability to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness. (Tr. 405)

Dr. McGee found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and respond appropriately to changes in the work setting. Dr. McGee found no evidence of limitation in Plaintiff's ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Tr. 405). Dr. McGee concluded that Plaintiff retained the ability for simple repetitive tasks; that a decreased emphasis on pace would lessen her stress; that limited social interaction would lessen her stress; and that Plaintiff might need extra support to handle and adjust to changes. (Tr. 406).

Notes dated September 16, 2003, state that Plaintiff was sleepwalking almost every night. (Tr. 497).

Dr. Mertens reported on October 29, 2003, that Plaintiff exhibited abnormal sleep behavior; that Plaintiff was being evaluated by sleep specialists; that Plaintiff's diabetes had not progressed; that there were no known functional limitations due to her diabetes; and that Plaintiff's last physical exam in June 2003 revealed no significant findings. Dr. Mertens also stated that she has weight gain from Risperdal. (Tr. 490).

Case action notes of John R. Raabe, M.D., dated November 12, 2003, state that "AP notes no progression or functional limitations" and that "MER would indicate that the claimant's physical impairments are 'not severe.'" (Tr. 368).

On November 13, 2003, Sherry Bassi, Ph.D., reported on a psychiatric review technique form that Plaintiff's medical disposition was based on affective disorders and that a RFC assessment was necessary. (Tr. 369) Dr. Bassi reported that Plaintiff had a disturbance of mood, with a full or partial

manic or depressive syndrome; that Plaintiff's affective disorder was evidenced by "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)"; that Plaintiff had a medically determinable impairment which did not precisely satisfy the diagnostic criteria on the form.[2] (Tr. 372).

Dr. Bassi reported that Plaintiff's activities of daily living were mildly restricted; that Plaintiff had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and that Plaintiff did not have episodes of decompensation of extended duration. (Tr. 379). Dr. Bassi further reported that Plaintiff's account of her activities of daily living revealed that she was functioning as a home-maker; that she attended meetings, that she took care of her children; and that she worked out and shopped. Dr. Bassi concluded that Plaintiff might occasionally need extra support during periods of stress and that Plaintiff had exhibited medical improvement consistent with the ability to do simple work. (Tr. 381).

On November 13, 2003, Dr. Bassi also conducted a Mental RFC Assessment of Plaintiff and reported that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with

---

[2]     It is unclear if Dr. Bassi intended to mark the check box indicating this conclusion about other medically determinable impairments. It appears that the box was checked but part of the check mark is covered with "white out."

coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Dr. Bassi concluded that Plaintiff was moderately limited in her ability to understand and remember detailed instructions. (Tr. 384-385).

Dr. Bassi further found on November 13, 2003, that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, complete a normal work-day and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and respond appropriately to changes in the work setting. (Tr. 384-385). Dr. Bassi also found that Plaintiff exhibited no evidence of limitation in her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, and make plans independently of others. (Tr. 385). Dr. Bassi concluded that Plaintiff could follow simple directions, make basic work-related decisions, relate adequately to peers and supervisors, and adapt to routine changes in a work environment. (Tr. 386).

On February 17, 2004, Dr. Ohlms completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Plaintiff and reported that Plaintiff had a fair ability to follow work rules; that she had poor ability or no ability at all to relate to co-workers, deal with the public, use judgement, interact with supervisors, deal with work stresses, function independently, and maintain attention/concentration. Dr. Ohlms noted that Plaintiff had been depressed since age five; that she was very anxious; that she felt "drained" and tearful; that she was easily agitated; that she had terminal insomnia; that she could get suicidal; that she had poor stress management and poor hygiene; that she was pre-diabetic and hypertensive; and that she had Von Willebrand's Disease. Dr. Ohlms further reported that when he first saw Plaintiff on May 18, 2000, she was an alcoholic who had just begun

abstaining from alcohol; that Plaintiff attended AA meetings; and that Plaintiff had followed his instructions to continue abstaining from alcohol. Dr. Ohlms reported that Plaintiff had a fair ability to understand, remember, and carry out complex job instructions; to understand, remember and carry out detailed, but not complex, job instructions; and to understand, remember and carry out simple job instructions. Dr. Ohlms noted that Plaintiff was heavily medicated and that she experienced sedative side effects which affected her recent memory and concentration. (Tr. 484-486). Dr. Ohlms also reported that Plaintiff had a poor ability or no ability at all to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. Dr. Ohlms stated that Plaintiff could get severely depressed with psychotic features; that she was easily agitated; and that she had poor coping skills. Dr. Ohlms concluded that Plaintiff could manage benefits in her own best interest.[3] (Tr. 485-86).

In a letter dated February 18, 2004, Dr. Ohlms reported that Plaintiff had been under his care since May 18, 2000; that despite heavy medication, Plaintiff's depression remained treatment resistant; that she became psychotic with a strong suicidal ideation and plan which resulted in hospitalization at Depaul Health Center from May 25 through June 2, 2000; that she had been on heavy medication since her release from Depaul Health Center; that her depression had "waxed and waned but overall it ha[d] been incapacitating"; that her depression and medications had caused a 100 pound weight gain, hypertension and pre-diabetes; that for several months in 2003 she experienced severe sleep-walking; that her sleepwalking was probably attributable to her medications; and that Plaintiff was currently taking two antidepressants and an antipsychotic drug. Dr. Ohlms stated in this letter that Plaintiff was "totally disabled by her depression"; that she had continued to isolate herself; that she had poor coping skills, that she became easily agitated with minimal stress; that she was heavily medicated;

---

[3]     A portion of Dr. Ohlms's report is not legible.

and that he did not consider her employable at that time or at any time since his first evaluated her in May 2000. (Tr. 483)

Dr. Mertens examined Plaintiff on June 24, 2004, at St. John's Mercy Medical Center. Her report of this date states that Plaintiff stated that she was "very busy taking care of her mother and problems in their home and ha[d] been not exercising for a significant period of time, at least for several weeks." Dr. Mertens further reported that Plaintiff appeared older than her stated age; that she was obese; that she was without distress; that she was pleasant and cooperative; that Plaintiff had diabetes mellitus type 2 poorly controlled, hypertension, dermatofibroma of the shoulder, and hyperlipidemia; that Plaintiff had a lot of room for lifestyle modification; and that Plaintiff agreed to start exercising and eating healthier. (Tr. 476-477).

Dr. Mertens's records reflect that she saw Plaintiff on August 17, 2004, on which date she noted that Plaintiff had diabetes mellitus type II, uncontrolled; that she was not compliant with her diet instructions; that she was not exercising; that Plaintiff had hypertension; that Plaintiff had normal activity and energy levels; that she had no change in appetite; that she had no major weight gain or loss; that she had a history of previous alcohol and illicit drug abuse; that she had been "sober X many years"; and that Plaintiff appeared healthy and without distress. (Tr. 473-474). Dr. Mertens further reported that Plaintiff felt she was "doing the best she ever has since being on Risperdal." Dr. Mertens also reported that Plaintiff was oriented; that she had normal memory; and that she had appropriate mood, affect, and judgment. (Tr. 473-475).

On November 5, 2004, Shruti Shivpuri, M.D., treated Plaintiff for an upper respiratory illness at Mercy Family Medicine. (Tr. 470-471).

Dr. Shivpuri's notes reflect that Plaintiff was seen on November 12, 2004, and that she appeared healthy on this date and was without distress. Dr. Shivpuri reported that Plaintiff's acute

bronchitis had improved; that Plaintiff was still smoking; that she had been advised to stop using tobacco; and that she "[did] not feel quite normal yet" (Tr. 468-469).

On November 22, 2004, Dr. Mertens saw Plaintiff for a follow-up evaluation. Dr. Mertens's record of this visit reflects that Plaintiff's fiancé was out of prison; that Plaintiff's mother was having a difficult time adjusting to the change in the family; that Plaintiff likewise felt very stressed; that Plaintiff had a history of diabetes mellitus type II uncontrolled; that her diabetes was not at goal; that she was somewhat compliant with her diet; that she had a history of hyperlipidemia; that she had a history of hypertension; that Plaintiff was obese; and that she was older than her stated age. (Tr. 466-467).

In a letter dated January 27, 2005, Dr. Ohlms stated that he continued to agree with his previous diagnosis and assessment of Plaintiff. (Tr. 464). In a letter dated March 5, 2005, Dr. Ohlms stated that Plaintiff was sober when he first saw her in May of 2000; that she remained completely sober over the years; and that she was an active member of AA. (Tr. 463).

## IV.
## DECISION OF THE ALJ

The ALJ first noted that Plaintiff originally applied for disability on August 17, 1999; that on August 9, 2000, an ALJ issued a favorable decision, finding Plaintiff disabled as of June 1, 1996, due to recurrent major depression with psychotic features and anxiety; that upon review, Plaintiff's disability was determined to have ceased on August 15, 2003; and that her entitlement to a Period of Disability and Disability Insurance Benefits was terminated as of October 2003. (Tr. 11, 16). The ALJ then considered Plaintiff's age, education, and work history. (Tr. 12).

The ALJ followed the sequential evaluation analysis of 20 CFR 404.1994(f) to determine whether Plaintiff's disability had ceased. (Tr. 12). At Step 1 of the sequential analysis, the ALJ found no evidence suggesting that Plaintiff had engaged in substantial gainful activity since she was awarded

benefits. (Tr. 12). At Step 2, the ALJ considered Plaintiff's activities of daily living and her social functioning activities. The ALJ found that Plaintiff had adequate concentration, persistence and pace to fully care for herself and perform a wide range of duties for her children and her disabled mother and that Plaintiff had not exhibited any episodes of decompensation of extended duration since she went on benefits. The ALJ concluded that Plaintiff did not exhibit any of the four following conditions at Listing Level severity: (1) marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties of concentration, persistence or pace, or (4) repeated episodes of decompensation each of extended duration. (Tr. 12). The ALJ also concluded that Plaintiff did not meet the requirements of Listing 12.04B or 12.06B for a depressive or anxiety disorder and failed to submit evidence to support the alternative requirements of Listing 12.04C or 12.06C. The ALJ noted that Plaintiff has some physical impairments; that they are not severe; and that Plaintiff acknowledged at the hearing that she was not *physically* disabled. (Tr. 12). Considered both individually and in combination with one another, the ALJ concluded that Plaintiff's impairments did not satisfy the requirements of the Listing of Impairments in Appendix 1, Part 404, Subpart P. (Tr. 12).

At Step 3 of the sequential analysis, the ALJ found a decrease in the medical severity of Plaintiff's impairments of depression and anxiety and found medical improvements since Plaintiff's last favorable medical disability decision. (Tr. 12-13). After comparing Plaintiff's current medical condition and impairments to those at the time she was awarded benefits, the ALJ concluded that Plaintiff underwent marked medical improvements. The ALJ found that Plaintiff was able to relate more appropriately to others, maintain adequate concentration and attention, demonstrate reliability and tolerate stress and that, therefore, she experienced fewer and less substantial restrictions of her functional capacity and experienced medical improvement related to her ability to work. (Tr. 13).

At Step 4, the ALJ considered whether Plaintiff had an impairment or combination of impairments that were severe and found that Plaintiff's depression and anxiety were severe according to the Social Security Rulings 85-28 and 96-3p. (Tr. 13).

The ALJ then considered Plaintiff's residual functional capacity ("RFC"). (Tr. 13-14). The ALJ noted that, in assessing her RFC, Plaintiff's allegations of her symptoms must be carefully considered. The ALJ stated that a medically determinable impairment was necessary for a finding of disability; however Plaintiff's subjective complaints would not be disregarded solely because the objective medical evidence did not fully support her complaints, nor would they be accepted or reject solely on the basis of personal observations. In addition to the objective medical evidence, the ALJ noted that, in order to evaluate the credibility of Plaintiff's subjective complaints, he would also consider Plaintiff's prior work record, third party or examining/treating physicians' observations regarding Plaintiff's daily activities, duration, frequency and intensity of pain, precipitating and aggravating factors, dosage, effectiveness and side effects of her medication, other treatments for relief of symptoms, and functional restrictions. (Tr. 14).

The ALJ concluded that Plaintiff's severe psychiatric illness/impairment was well controlled with treatment; that Plaintiff could demonstrate reliability in a work setting; that she could respond appropriately to deadlines, supervisors, coworkers, the public, and routine changes in a work setting; that she had no physical limitations on her ability to work; and that she reported that she was not physically disabled. The ALJ then considered Plaintiff's past relevant work, as reported by Plaintiff, and concluded that she did not have any mental or physical work related limitations which would prevent her from performing past relevant work as she performed it or as it was generally performed in the national economy. (Tr. 16).

The ALJ concluded that Plaintiff was not disabled because, with her residual functional capacity, she could perform past relevant work. The ALJ noted that he considered the opinions of the State Agency Medical Consultants as required by Social Security Ruling 96-6p, the RFC assessments of three reviewing psychologists, Dr. Mertens' records, and Plaintiff's testimony. The ALJ further noted that he gave the most weight to Dr. Mertens' records. (Tr. 16)

## V.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's

residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § § 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980);

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in

evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 902 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by

substantial evidence.  <u>Warner v. Heckler</u>, 722 F.2d 428, 431(8th Cir. 1983).  Second, once the

plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that

there are jobs available in the national economy that can realistically be performed by someone

with the plaintiff's qualifications and capabilities.  <u>Nevland</u>, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used.

An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's

limitations, but only those which he finds credible.  <u>Rautio</u>, 862 F.2d at 180; <u>Roberts v. Heckler</u>,

783 F.2d 110, 112 (8th Cir. 1985).  Use of the Medical-Vocational Guidelines is appropriate if the

ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. <u>Carlock v.</u>

<u>Sullivan</u>, 902 F.2d 1341, 1343 (8th Cir. 1990); <u>Hutsell</u>, 892 F.2d at 750.

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final

determination that Plaintiff was not disabled.  <u>Onstead</u>, 962 F.2d at 804.  Thus, even if there is

substantial evidence that would support a decision opposite to that of the Commissioner, the court

must affirm her decision as long as there is substantial evidence in favor of the Commissioner's

position.  <u>Krogmeier</u>, 294 F.3d at 1022.

Plaintiff contends that the ALJ incorrectly afforded great weight to Dr. Mertens's opinion;

that the ALJ did not comply with his obligation to develop the record; that the ALJ failed to address

the significance of Dr. Deppe's report; that the ALJ failed to articulate a legally sufficient basis upon

which to discredit the opinion of Dr. Ohlms; that the ALJ's conclusion that Plaintiff's impairments

have improved is without merit; that the ALJ failed to properly consider Plaintiff's subjective

complaints pursuant to <u>Polaski</u>; that Plaintiff's daily activities are not inconsistent with Dr. Ohlms's

opinion or the GAF score reported by Dr. Deppe; that Plaintiff has significant side effects from

medication; that the third party observation supports a conclusion that Plaintiff is disabled; that the ALJ failed to properly evaluate Plaintiff's past relevant work pursuant to Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999); that the ALJ improperly determined Plaintiff's RFC; that the mental demands of bookkeeping and data entry do not amount to simple repetitive work; and that the ALJ should have consulted a vocational expert because Plaintiff has a significant nonexertional limitation.

### A.    The Opinions of Treating and Examining Doctors:

The ALJ considered Dr. Ohlms's disability assessment and checklist and his conclusion that Plaintiff was totally disabled by depression and had no useful ability to function in almost every mental work related area. The ALJ concluded that Dr. Ohlms's conclusions were not consistent with Plaintiff's treatment or the reports Dr. Ohlms made while Plaintiff was on benefits. The ALJ noted that "[o]ver the three years from 2001 through 2003, very little was noted in the way of abnormal mental status examination findings, medication side effects or even subjective psychiatric symptoms. Generally individuals who only need to see a psychiatrist 2-3 times a year, who have a good mood, who feel serene, who are doing okay and well, and who report few psychiatric symptoms are not disabled and completely unable to function in almost every mental work related area." (Tr. 14-15). Further, the ALJ considered that Dr. Ohlms's records were brief and reported very few mental and psychiatric examination findings. (Tr. 15).

The ALJ further considered the records of Dr. Mertens, who was also Plaintiff's treating physician, and that Dr. Mertens's opinion and records were inconsistent with Dr. Ohlms's functional capacity conclusions; that Dr. Mertens outlined her psychiatric findings in much greater detail than Dr. Ohlms; that Dr. Mertens reported a slightly flat affect on one occasion; and that otherwise Dr. Mertens's psychiatric conclusions regarding Plaintiff's condition were completely unremarkable. The

ALJ concluded that normal psychiatric examinations by Plaintiff's treating physician for a period of time both prior to and after Plaintiff's disability cessation date are inconsistent with her claim of disability. The ALJ considered Plaintiff's activities of daily living and social functioning activities in this regard and concluded that Dr. Mertens's relatively benign psychiatric reports were consistent with Plaintiff's activity level. (Tr. 15).

The ALJ found that, although Dr. Ohlms was an expert in the field of Plaintiff's alleged disability, Dr. Mertens' records were entitled to more weight because she was a treating physician, because she reported actual mental status examination findings over an extended period of time, and because her records were more detailed with respect to Plaintiff's mental condition.

The court notes that the record reflects that Dr. Ohlms reported on February 17, 2004, that Plaintiff had a fair ability to understand, remember, and carry out complex job instructions. Moreover, he reported that her ability to follow work rules was fair. Significantly, Dr. Mertens reported in June 2004 that Plaintiff was without distress and that she was very busy taking care of her mother. In August 2004 Dr. Mertens, who had been treating Plaintiff on an ongoing basis, reported that Plaintiff was doing the best she had ever done since being on Risperdal; that Plaintiff was oriented; that she had normal memory; and that she had appropriate mood, affect, and judgment. In regard to the opinion of expert consulting psychologist Dr. Deppe,[4] the ALJ considered that this psychologist only

---

[4]     The ALJ did not mention Dr. Deppe by name but it is clear from the ALJ's description of the consultant's findings that he was referring to Dr. Deppe. Thus, to the extent that Plaintiff contends that the ALJ did not consider Dr. Deppe's report, Plaintiff is mistaken. Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"); Moore ex rel. Moore v. Barnhart, 413 F.3d718, 721 n.3 (8th Cir. 2005) ("The fact that the ALJ's decision does not specifically mention the [particular listing] does not affect our review."); Montgomery v. Chater, 69 F.3d 273,275 (8th Cir. 1995).

saw Plaintiff once, which was in 2003; that Plaintiff possibly misled this consulting psychologist by reporting that she had been sober for 12 years when she previously reported to Dr. Ohlms in 2000 that she had only recently been sober; and that the consulting psychologist's diagnosis of bipolar disorder was inconsistent with Dr. Mertens's and Dr. Ohlms's assessments. Thus, the ALJ concluded that the consulting psychologists' opinion should be given little weight. (Tr. 16). The court notes that Dr. Deppe also reported that, among other things, Plaintiff's social functioning, judgment and insight, and ability to relate to others and to understand and follow simple instructions appeared fair.

Additionally, the court notes that Dr. McGee, who reviewed Plaintiff's records, concluded that Plaintiff's condition had greatly improved; that her limitations were moderate; and that Plaintiff currently had the ability for simple tasks. Likewise Dr. Bassi concluded that Plaintiff could follow simple directions, make basic work-related decisions, relate adequately to peers and supervisors, and adapt to routine changes in the work environment.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). See also Tindell v. Barnhart, Slip Op. 05-2873 at *4 (8th Cir. Apr. 19, 2006) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005). The opinions and findings of the plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000)(citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d

422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data). Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). "Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlin, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424).

Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms," that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). Additionally, SSR 96-2p clarifies that 20 C.F.R. § § 404.1527 and 416.927 require that the ALJ provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.").

First, consistent with the Regulations the ALJ credited the opinion of Dr. Mertens who was Plaintiff's treating doctor. See Cunningham, 222 F.3d at 502; Kelley, 133 F.3d at 589. Second, the ALJ set forth specific reasons for crediting her opinion over the opinion of specialists; the ALJ considered that Dr. Mertens reported actual mental status examination findings over an extended period of time and that her records provided great detail. See Turpin, 813 F.2d at 171. Additionally, the ALJ considered the record as a whole and that other doctors reached conclusions consistent with those of Dr. Mertens. See Wilson, 172 F.3d at 542. Consistent with the case law and the Regulations, the ALJ considered that Dr. Mertens's opinion was supported by sufficient medically acceptable clinical data. See Chamberlain, 47 F.3d at 1494.

Moreover, the ALJ was not bound to follow Dr. Ohlms's conclusion in his letters of February 2004 and of March 2005 that Plaintiff is unable to work. A treating physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic

evidence). On the other hand, a treating physician's observations should not necessarily be treated as conclusory where the doctor had "numerous examinations and hospital visits" with a claimant. See Turpin v. Bowen, 813 F.2d 165, 171 (8th Cir.1987). As set forth above, the ALJ articulated his reasons for not following Dr. Ohlms's conclusions.

To the extent that Plaintiff contends the ALJ incorrectly found that her condition had improved as reported by Dr. Mertens, records of March 2001 reflect that Plaintiff was doing well, notes of December 2001 reflect that Plaintiff's mood was good and serene, and notes of September 2002 reflect that Plaintiff was doing well. Plaintiff herself reported on May 14, 2003, that she has improved in some areas and that her condition had improved greatly over the past few years. She further stated that her life and abilities had improved. Also, on May 28, 2003, Plaintiff reported that all of her symptoms has lessened and that a few had ceased completely and that she only experienced symptoms about once a month for about two to five days and that praying helped relieve the symptoms. Additionally, as noted by the ALJ, Plaintiff's GAF had been as low as 30 when she was previously granted benefits and since that time her scores have not been that low. Indeed, during the relevant period Dr. Deppe reported that Plaintiff's GAF was 50.[5] Although low, this GAF score reflects improvement in Plaintiff's condition.

The court finds, therefore, that the ALJ's discrediting Dr. Ohlms's and Dr. Deppe's conclusions, including his report of Plaintiff's GAF, crediting the opinion of Dr. Mertens, and

---

[5] Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Indeed, a GAF of 50 is one point away from a finding of a moderate impairment. Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 41 to 50 represent "serious" and scores of 51 to 60 represent "moderate. Id. at 32.

concluding that Plaintiff's condition had substantially improved is supported by substantial evidence on the record and that it is consistent with the case law and Regulations.

To the extent that Plaintiff contends that the ALJ should have recontacted any doctor of record, the court notes that the record in this matter is extensive and that, as discussed by the ALJ, Dr. Mertens's records were specific and detailed in regard to Plaintiff's condition during the relevant time period. Where the record contains medical records and opinions of doctors, other than a claimant's treating physician, each of whom evaluated the claimant's limitations, an ALJ need not recontact the claimant's treating doctor. Weiler v. Apfel, 179 F.2d 1107, 1111 (8th Cir. 1999). Additionally, "[w]hile the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" Goff v. Barnhart, 421 F.3d 785, 791(8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). The court finds that the record was sufficiently developed and that, therefore, the ALJ had no obligation to develop the record further by recontacting any doctor or psychologist.

**B.      Polaski:**

As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Guillams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. While the ALJ in the matter under consideration did not address every Polaski factor, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor

as long as the analytical framework is recognized and considered."); <u>Strongson</u>, 361 F.3d at 1072; <u>Brown v. Chater,</u> 87 F. 3d 963, 966 (8th Cir. 1996).

The ALJ in the matter under consideration held that Plaintiff's subjective complaints and the observations of third parties and medical professionals were a relevant consideration upon determining the severity of Plaintiff's complaints. The ALJ further noted that the relevant subjective complaints include Plaintiff's daily activities, the dosage, side effects and effectiveness of her medication, and functional restrictions. (Tr. 14). Relying on <u>Polaski</u>, 739 F.2d at 1321-22, the ALJ held that Plaintiff's subjective complaints could be discredited if not consistent with the evidence as a whole. (Tr. 14). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered Plaintiff's activities of daily living. He considered that Plaintiff stays very busy taking care of her mother; that she takes care of her children and three dogs; that she cleans, shops, camps, reads, cooks, does the laundry, takes care of household finances, drives her mother and children, has a fiancé, attends AA meetings regularly, enjoys having people over, attends her daughter's school activities, and performs a wide range of duties for her children and disabled mother. (Tr. 12, 15). The court also notes that on May 28, 2003, Plaintiff reported that she leaves her house everyday and that she had no difficulty driving. In October 2003 she reported that she rubber stamps and makes cards. Describing her daily routine in October 2003, Plaintiff said that she works out, prepares meals, gets her daughter off to school, and uses a computer.

While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. <u>Eichelberger,</u> 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff

watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit her allegation that she is unable to work. The court further finds that substantial evidence supports the ALJ's decision in this regard.

Second, the ALJ considered that from 2001 though 2003, little was noted in regard to medication side effects. Significantly, in October 2002 Dr. Mertens reported that there were no changes in Plaintiff's medications. While Dr. Ohlms noted in February 2004 that Plaintiff's sleepwalking was probably attributable to her medications, he also noted that she had this problem for several months in 2003; he did not indicate that this side effect persisted. The absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). The court finds that the ALJ properly considered that Plaintiff did not suffer significant side effects from medications and that substantial evidence on the record supports this conclusion.

Third, the ALJ considered that individuals who only see a psychiatrist two to three times a year are not disabled. The ALJ also considered that Plaintiff has not required any hospitalizations since going on benefits. See Rautio v. Bowen, 862 F. 2d 176, 179 (8th Cir. 1988) (holding that the failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling pain). Moreover, seeking limited medical treatment is inconsistent with claims of disabling pain. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). The court finds that the ALJ's decision in regard to Plaintiff's medical treatment is consistent with the case law and that it is supported by substantial evidence.

Fourth, the court notes that Plaintiff reported to Dr. Deppe that her medications were helpful. Also, Dr. Deppe concluded that when Plaintiff was compliant with her medications she was capable of managing her own funds. Conditions which can be controlled by treatment are not disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James, 870 F.2d at 450.

**C.    Plaintiff's Past Relevant Work:**

The ALJ considered that Plaintiff's past relevant work included bookkeeping/data entry which involved producing financial reports, entering data on a computer, distributing goods and working with shipping/receiving records. He further considered that Plaintiff's past relevant work did not require that she lift or carry more than twenty pounds and that in her past relevant work she sat six out of eight work hours. Having concluded that Plaintiff's psychiatric illness had improved to the extent that Plaintiff can demonstrate reliability and respond appropriately to routine changes in work setting, deadline, supervisors, coworkers, and the public, and having concluded that Plaintiff's psychiatric illness was well controlled, the ALJ further concluded that Plaintiff does not have any

mental or physical work related limitations that prevent her from performing her past relevant work in bookkeeping/data entry as she performed it or as it is generally performed in the national economy. The ALJ, nonetheless, concluded that Plaintiff does have a severe mental impairment.

Resort to the Medical-Vocational Guidelines is only appropriate when there are no nonexertional impairments that substantially limit the ability of Plaintiff to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. Robinson, 956 F.2d at 839. See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. Robinson, 956 F.2d at 839. If, however, the claimant is also found to have nonexertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. See id.

Additionally, 20 C.F.R. § 404.1560 states in relevant part in regard to a claimant's ability to perform past relevant work:

(b) Past relevant work ...

(2) Determining whether you can do your past relevant work. We will ask you for information about work you have done in the past. We may also ask other people who know about your work. (See § 404.1565(b).) We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the

national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

(3) If you can do your past relevant work. If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy. ...

(c) Other work.

(1) If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

(2) In order to support a finding that you are not disabled at this fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors. We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work.

SSR 83-10, 1983 WL 31251, at *1, clarifies the proper use of the Guidelines in the sequential analysis for determining whether a claimant is disabled and states in relevant part:

[T]he fifth and last step in the process, the individual's residual functional capacity (RFC) in conjunction with his or her age, education, and work experience, are considered to determine whether the individual can engage in any other substantial gainful work which exists in the national economy. (See the glossary at the end of the policy statement for definitions of terms and concepts commonly used in medical-vocational evaluation--e.g., RFC.)

To increase the consistency and promote the uniformity with which disability determinations are made at this step at all levels of adjudication, the regulations for determining disability were expanded in February 1979. Appendix 2 was provided to establish specific numbered table rules for use in medical-vocational evaluation.

SSR 83-10, 1983 WL 31251, at *6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." SSR 83-10, 1983 WL 31251, at *6, defines nonexertional restriction as an "impairment-caused need to avoid one or more environmental conditions in a workplace."

The Eighth Circuit has explained the circumstances when a claimant has nonexertional limitations but the ALJ need not resort to the testimony of a vocational expert. The court held in Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992), that:

> "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir.1988). However, if the claimant's nonexertional impairments diminish his or her residual functional capacity to perform the full range of activities listed in the Guidelines, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics. Id. at 349. "Nonexertional limitations are limitations other than on strength but which nonetheless reduce an individual's ability to work." Asher v. Bowen, 837 F.2d 825, 827 n. 2 (8th Cir.1988). Examples include "mental, sensory, or skin impairments, as well as impairments which result in postural and manipulative limitations or environmental restrictions." Id.; See 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e) (1992).

See also Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir.1995).

Additionally, an ALJ posing a hypothetical to a vocational expert is not required to include all of a claimant's limitations, but only those which he finds credible.  Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989); Rautio, 862 F.2d at 180.  The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobana, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985).  Where a hypothetical question sets precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes evidence supporting the ALJ's decision.  Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

A severe mental impairment such as the ALJ found Plaintiff in the matter under consideration to have, however, is a significant nonexertional impairment that must be considered by a vocational expert.  See  Grisson v. Barnhart, 416 F.3d 834, 837 (8th Cir. 2005) (quoting Lucy v. Chater, 115 F.3d 905, 908 (8th Cir. 1997).  While Plaintiff's severe mental impairment may not rise to the level of a disability by itself, she is nevertheless entitled to have a vocational expert consider this condition to determine how it impacts her residual functional capacity. See id.  Because the ALJ did not solicit the testimony of a vocational expert to determine the impact of Plaintiff's severe mental impairment upon her ability to perform her past relevant work, the court finds that the ALJ's decision is not supported by substantial evidence.  The court will, therefore, reverse this matter and remand it to the ALJ so that the record can be fully developed in accordance with this decision.  Upon remand the ALJ should submit a hypothetical to a vocational expert which includes Plaintiff's severe mental impairment as found by the ALJ.  The vocational expert should be asked to opine whether a person with Plaintiff's limitations can perform Plaintiff's past relevant work.  In the event that the vocational

expert finds that Plaintiff cannot perform her past relevant work, the ALJ need not necessarily find Plaintiff disabled. Rather, the vocational expert should be asked if there are jobs in the economy which a person with Plaintiff's limitations can perform.

## VII.
## CONCLUSION

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ is directed to fully develop the record in a manner consistent with this court's opinion. **The court stresses that upon reversing and remanding this matter it does not mean to imply that the Commission should return a finding of "disabled."** The court is merely concerned that the Commissioner's final determination, as it presently stands, is not supported by substantial evidence on the record as a whole.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief which Plaintiff seeks in her Brief in Support of Complaint is **GRANTED** in part, and **DENIED**, in part. [Doc. 16]

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will issue contemporaneously herewith remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

**IT IS FURTHER ORDERED** that upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.


/s/Mary Ann L. Medler
MARY ANN L. MEDLER
Dated this 24th day of August, 2006.          UNITED STATES MAGISTRATE JUDGE